# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CORBY D. BUSH,                    :

     Plaintiff,               :
                               Case No. 3:12cv00214

 vs.                              :

                               District Judge Thomas M. Rose

CAROLYN W. COLVIN,               :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,         :

     Defendant.               :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.  Introduction

Plaintiff Corby Bush brings this case pursuant to 42 U.S.C. § 405(g) for judicial

review of the Social Security Administration's denial of his application for Supplemental

Security Income ("SSI").  Plaintiff received SSI benefits from 1993 to 1998.  (Doc. #7 at

*PageID#* 807, citing *PageID##* 124-25, 299).  In October 1998, Plaintiff was incarcerated

for a drug possession charge and his SSI benefits were discontinued.[2]  (*PageID##* 140,

385).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

[2] Under the Social Security statutory and regulatory scheme, Plaintiff was ineligible to receive
Social Security benefits during his incarceration. *See* 42 U.S.C. § 1382(e)(l)(A) (excluding from
eligibility for SSI an inmate of a public institution.); 20 C.F.R. § 416.211 (same). *See also Schweiker v.
Wilson,* 450 U.S. 221, 224 (1981).

Plaintiff filed his current SSI application on December 7, 2007, asserting that he has been under a "disability" since May 1, 2003.  (*PageID##* 261-69).  Plaintiff claims to be disabled due to degenerative disc disease, paranoid schizophrenia, and a gun shot wound.  (*See PageID#* 303).

The Social Security Administration denied Plaintiff's second SSI application at each stage of the administrative review.  The most significant stage for present purposes involved two hearings before Administration Law Judge (ALJ) Thomas R. McNichols, II (*PageID##* 90-120, 121-48).  After the close of those hearings, ALJ McNichols issued a written decision concluding that Plaintiff did not suffer from a "disability" within the meaning of the Social Security Act.  (*PageID##* 74-83).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. # 6), and the record as a whole.

## II.  **Background**

### A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was 36 years old on the date his application was filed, which defined him as a "younger individual" for purposes of resolving his SSI claim.  *See* 20 C.F.R. § 416.963(c); (*PageID##* 82, 261).  Plaintiff has a ninth grade "limited" education.  *See* 20

C.F.R. §416.964(b)(4); (*PageID##* 128, 308).  He has no past relevant employment.

(*PageID##* 82, 303).

At the August 4, 2010 administrative hearing, Plaintiff testified that he lived with

his girlfriend and children.  (*PageID##* 126-27).  At the time of the hearing, Plaintiff did

not have a driver's license, but did have a license in the past.  (*PageID##* 127-28).  He

believes his driver's license was suspended due to his drug case.  (*PageID#* 128).  He is

able to read "a little" and can read "some" of a newspaper.  (*PageID#* 129).

Plaintiff testified that he cannot work due to his mental stability.  He stated, "I hear

voices."  (*PageID#* 131).  Plaintiff testified that the voices keep him paranoid and he

wants to hurt people or hurt himself.  (*Id.*).  He noted that he does not react on the

impulses, "but every now and then I might hurt myself."  (*PageID#*132).  He also suffers

from anger and depression, which keeps him "on edge."  (*PageID#* 132).  Plaintiff

testified that he takes medication for his psychological problems and it helps "[a] little."

(*Id.*).  He also attends counseling once a month.  (*Id.*).  He has not been hospitalized for

his mental problems.  (*PageID#* 133).  When asked how his mental problems affect his

ability to work, Plaintiff replied that he does not get along with people and feels paranoid.

(*Id.*).  Plaintiff does not take any public transportation, rather, his mother takes him

around to places.  (*PageID#* 137).

As far as household chores, Plaintiff testified that he does not cook; will wash

dishes, "[m]aybe every blue moon"; does not sweep, mop, vacuum, or wash cloths.

(*PageID#* 137).  He will occasionally shop with the person who is "buying me clothes"

3

(*Id.*).  He does not go to church, but sometimes visits with friends or relatives.

(*PageID##* 137-38).

Plaintiff testified he stopped drinking alcohol approximately 5 years prior to the

hearing and stopped taking controlled substances about "a year or two" prior to the

hearing. (*PageID##* 139-40).  Plaintiff testified that he was arrested three to four times for

drug possession and served one year in prison.  (*PageID#* 140).

At the December 21, 2010 administrative hearing, Plaintiff testified that he does

not have a driver's license but drives once or twice a month.  (*PageID#* 95).  He

acknowledged that he stopped going to school in the ninth grade, but did not remember if

he was in special education.  (*Id.*).  Plaintiff testified that he hears voices telling him to

harm the other people around him.  (*PageID#* 97).

### B.    Vocational Expert Testimony

The ALJ's residual functional capacity ("RFC") assessment[3], which he

incorporated in his hypothetical questions to the vocational expert ("VE"), assumed an

individual with Plaintiff's age, education, and work experience who can perform medium

exertional work, with the following requirements: can never climb ropes, ladders, or

scaffolds; can occasionally stoop; no exposure to hazards; no dealing with the general

public; no complex or detailed instructions; simple, one- or two-step tasks requiring little,

if any, concentration; low stress jobs with no production quotas or over-the-shoulder

---

[3]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

supervision; and limited contact with coworkers and supervisors, with no teamwork. (*PageID*## 116-17).  The VE responded that Plaintiff would be able to perform 15,000 medium jobs, such as a hospital cleaner, order filler, machine packager, and washer; 20,000 light job, such as an electronics worker, machine tender, laundry folder, and mail clerk; and 3,000 sedentary jobs, such as a toy stuffer, weight tester, charge account clerk, and patcher.  (*PageID*## 116-118).

The VE further testified that her testimony is consistent with the *Dictionary of Occupational Titles*.  (*PageID*# 118).

With the added limitation of "no work in proximity to others and needing to work completely independently," the VE testified that it would eliminate competitive employment.  (*PageID*# 118).

### C.     Medical Opinions

Turning to the other evidence and other information in the administrative record, the parties have provided informative and detailed descriptions of that evidence.  *See* Doc. #7 at *PageID*## 798-806; Doc. #10 at *PageID*## 823-28.  In light of this, and upon consideration of the complete administrative record, additional detailed discussion of the record would be unnecessarily duplicative.  A general identification of the medical sources upon whom the parties rely, however, will help frame further review and is therefore provided below.

### 1.     Oscar Cataldi, M.D.

5

Plaintiff relies on the opinion of his treating psychiatrist, Dr. Cataldi, who treated him through Day-Mont West.  Plaintiff began treatment at Day-Mont West in August 2008.  (*PageID##* 706-67).  Dr. Cataldi began treating Plaintiff in June 2009.  (*PageID#* 771).

Plaintiff was started on medication in January 2009.  (*PageID##* 710, 727). On June 26, 2009 (the first visit since January), Plaintiff told Dr. Cataldi that he ran out of medication.  (*PageID#* 739).  Plaintiff reported to Dr. Cataldi that while he was on medication he was feeling better, having less hallucinations and sleeping better.  (*Id.*). In July 2009, he reported that he was feeling "a little better," was having fewer angry outbursts, and less frequent auditory hallucinations.  (*PageID##* 737-38).  On November 6, 2009, it was noted that Plaintiff's participation in his treatment had been sporadic. (*PageID#* 735) . Also in November 2009, Plaintiff reported that his mother and girlfriend were his primary sources of support, that he was spending more time completing household chores, and that he believed at least one of his medications was helpful. (*PageID#* 730).  In March 2010, he reported that his medication was working well with no side effects.  (*PageID##* 748-49).  When seen on June 11, 2010, Plaintiff reported to Dr. Cataldi that he was okay and the "meds are helping."  (*PageID#* 746).

On June 30, 2010, Dr. Cataldi completed a medical assessment of ability to perform mental work related activities.  (*PageID##* 768-70).  Dr. Cataldi opined that Plaintiff had poor to no ability to: deal with the public; interact with supervisors; function independently; understand, remember, and carry out simple, detailed, or complex job

instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (*Id.*). Dr. Cataldi opined that Plaintiff cannot relate in social situations or demonstrate reliability because he avoided human contact and had "ideas of violence." (*PageID#* 770). Dr. Cataldi concluded that Plaintiff would not be able to manage his own benefits and was helped by his mother. (*Id.*).

Dr. Cataldi also completed interrogatories that same day. (*PageID##* 771-76). According to Dr. Cataldi, Plaintiff could not: respond appropriately to supervision, co-workers, and customary work pressures; withstand the pressure of meeting normal work standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of his physical and mental impairments; sustain attention and concentration on his work to meet normal standards of work productivity and work accuracy; understand, remember, and carry out simple work instructions without requiring very close supervision; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; maintain concentration and attention for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and complete a normal workday or workweek without interruptions from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods. (*PageID##* 772-76).

Dr. Cataldi concluded that Plaintiff had marked restrictions of his daily activities, social functioning, and in his concentration, persistence, or pace. (*PageID#* 776).

7

## 2.    **Giovanni Bonds, Ph.D.**

On February 25, 2008, Dr. Bonds consultatively examined Plaintiff at the request of the Ohio Bureau of Disability Determination ("BDD").  (*PageID##* 648-55).  Plaintiff reported to Dr. Bonds that he lived with his fiancé and their children.  He was unemployed.  He reported no mental, physical, or sexual abuse as a child.  (*PageID#* 648).  Plaintiff reported that he drank four nights per week (a couple of shots or beer), that he was currently using marijuana daily, and while he used to use crack daily, he stopped in 2003.  (*PageID#* 649).  He had no friends with whom he discusses his problems or spends time.  (*Id.*).  He reported that he was controlling and paranoid with his girlfriend because he was worried that she was unfaithful and he lost his temper easily.  He watched television for leisure activities.  He was arrested for drug possession and spent three years in prison.  He had a ninth grade education and left school because he could not get along with the other students.  He failed the test for his GED.  He had received social security until he went to prison in 1999, owing to his history of paranoid schizophrenia.  He was not under the influence of drugs or alcohol at the time of the evaluation.  (*PageID#* 650).

On mental state examination, Dr. Bonds observed Plaintiff's mood was depressed.  He felt hopeless and helpless.  Plaintiff reported that he was easily angered and, at times, physically aggressive.  He reported having no energy.  He was observed to be nervous and tense.  He isolated himself because he did not like to be around people.  He thought that people talked about him and were out to get him.  He had conversations with his dead

8

brother.  Dr. Bonds stated that Plaintiff had limited insight and understanding of his problems.  He also noted, "He does not have sufficient judgment or reasoning abilities to be able to live independently, make important decisions about his future or manage his funds without supervision."  He did no household chores except to take out the trash.  His girlfriend dropped him off at his mother's house when she went to work.  He did not do any childcare.  (*PageID#* 651).

WAIS-III testing was administered during this evaluation.  Plaintiff obtained a verbal IQ score of 63, performance IQ score of 63 and a full scale IQ score of 60. According to Dr. Bonds, Plaintiff did not take the testing seriously and his attention was poor.  Dr. Bonds remarked that Plaintiff's WAIS-III scores were "invalid due to his lack of motivation and effort."  (*PageID#* 652).

Dr. Bonds diagnosed Plaintiff with cannabis dependence, alcohol abuse, and major depressive disorder, severe with psychotic features.  He assigned Plaintiff a GAF score of 45.[4]

Dr. Bonds opined that Plaintiff's functional abilities and social functioning are severely limited.  He has "long standing problems with controlling his temper, being oppositional and defiant and engaging in antisocial activities."  (*PageID#* 653).

---

[4]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Comm'r of Soc. Sec.,* 61 Fed. Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34. Individuals with a GAF score of 45 are classified as having "serious symptoms ... or serious impairment in occupational, social, or school functioning." (*Id.*).

According to Dr. Bonds, Plaintiff's ability to relate to others was severely limited as he had "very poor social judgment and reasoning abilities." (*PageID#* 654). He was moderately restricted in his ability to understand, remember, and follow directions. His ability to perform simple, repetitive tasks was moderately limited and his concentration and attention were poor. His ability to deal with work stress was severely limited. He had "very low frustration tolerance [and] very poor coping skills." (*Id.*). He could not manage his funds as his judgment and reasoning skills were very poor. (*Id.*).

### 3.  <u>Joan Williams, Ph.D.</u>

After review of Plaintiff's medical record on March 15, 2008, Dr. Williams assessed Plaintiff's mental condition at the request of the Ohio BDD. (*PageID##* 660-77). Dr. Williams found Plaintiff had a mild restriction in his daily activities; moderate restrictions in maintaining social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation. (*PageID#* 670).

Dr. Williams determined that Plaintiff would have moderate restrictions in: his ability to maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (*PageID##* 674-75).

10

In the narrative assessment of Plaintiff's ability to engage in work-related activities from a mental standpoint, Dr. Williams felt that there should be reduced emphasis on the report from Dr. Bonds, "due to examiner's reliance on self report/self-presentation of reduced credibility." (*PageID#* 676).  Dr. Williams noted that while Plaintiff said he does not assist in childcare for any of his seven children, or drive, shop, or pay bills, he did not explain "the social demands and logistics of accessing marijuana for daily use." (*Id.*).  Dr. Williams found that while Dr. Bonds stated that Plaintiff's mental ability to relate to others was markedly impaired, there was "no objective observation to support this opinion." (*Id.*).  Dr. Williams noted that Plaintiff had "been with his fiancee for five years and continues to relate well with his mother and sister.  (*Id.*).  Dr. Williams noted that Dr. Bonds' opinion was not supported by the objective medical evidence, noting that Plaintiff did not have a lengthy documented psychiatric history suggesting a pattern of significant mental decompensations upon exposure to normative adaptive demands.  (*PageID#* 677). She also noted that Plaintiff "stated that he drinks 4 nights out of the week, a couple of shots or a beer.  He smokes marijuana on a daily basis, and he used to smoke crack on a daily basis." (*PageID#* 676).

Dr. Williams concluded that Plaintiff would be capable of performing "simple, repetitive tasks in an environment where interpersonal demands are relatively low." (*Id.*). On July 18, 2008, state agency psychologist, Leslie Rudy, Ph.D., affirmed Dr. Williams' assessment.  (*PageID#* 701).

### 4.  **Michael Firmin, Ph.D.**

11

Following the first administrative hearing, Plaintiff was again evaluated by the Ohio BDD.  Dr. Firmin evaluated Plaintiff on August 31, 2010.  (*PageID#* 777-87).  Plaintiff indicated the reason he cannot work is that, "I hear voices, I'm paranoid, I get frustrated and agitated easily.  I don't like to be around people."  (*PageID#* 777).  Plaintiff also reported that he did not participate in special education classes and did not have an Individual Education Plan ("IEP") while in school.  (*PageID#*778).  He considers himself to be a slow learner.  He participated in classes for children with emotional or behavioral problems.  He had special tutoring in school.  When discussing Plaintiff's work history, Dr. Firmin noted, "[t]he claimant's overall clinical presentation during the interview suggested that mental health elements seemingly would influence work-related activities because of anxiety, attention, and negative attitude."  (*PageID#* 778).

On mental state examination, Dr. Firmin observed that Plaintiff's clothing was messy and he described Plaintiff's thought processes as "pessimism and confusion, thought preoccupations centered on the presenting problem…."  (*PageID#* 779).  Plaintiff's facial expressions were sad, anxious, and nervous.  (*Id.*).  Dr. Firmin found Plaintiff's mood generally was downcast, tearful, nervous, and pessimistic, and his affect or emotional responsiveness was judged to be sad.  (*Id.*).  He also found that Plaintiff's abstract reasoning ability was borderline.  (*Id.*).  Dr. Firmin estimated Plaintiff's intellectual functioning to be in the mentally retarded range.  (*PageID#* 780).  His judgment and insight were impaired and unfocused.  Plaintiff performed little in the way of household chores.  He could not count change.  He phoned his family, watched

12

television, and listened to music. His speech quality was described as "mumbled,

quantity was minimal…." (*Id.*). He no longer drank alcohol or used illegal drugs. (*Id.*).

> Dr. Firmin indicated,
>
> He was clueless as to what it means to be paranoid and also had no idea as to what the word schizophrenia meant. Evidently, he heard a doctor use this term about him, and he associates it with him talking to himself at times. In exploring the DSM diagnostic criteria with the claimant regarding schizophrenia, the claimant did not fit the DSM symptoms. Consequently, I am not assigning a schizophrenia diagnosis for the claimant at the present time. Rather, I am assigning an anxiety diagnosis. It appears to me that what the claimant calls paranoid schizophrenia actually is extreme anxiety….

(*PageID#* 781). Dr. Firmin also stated, "Even this conclusion, however, is tenuous, since

it was extremely difficult to adequately appraise the claimant—given his limited

presentation and the manner in which he articulated himself during the clinical

interview." (*Id.*).

Dr. Firmin diagnosed major depression disorder, recurrent, mild and chronic, and

generalized anxiety disorder. Plaintiff was assigned a GAF score of 55.[5] (*PageID#* 782).

Dr. Firmin concluded that Plaintiff's mental abilities in relating to others suggest

marked impairment but noted that "this conclusion is based partly on self-report" and that

Plaintiff's ability in relating with family members was said to be fair. (*PageID#* 781).

Plaintiff's mental abilities in understanding, remembering, and following instructions for

simple, repetitive tasks was mildly impaired. (*Id.*). Dr. Firmin found that Plaintiff also

---

[5]A GAF score of 51-60 indicates that a person has "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

had moderate limitations in maintaining concentration, persistence, or pace, and mild impairments in withstanding the stress and pressure of day to day work activity. (*PageID#* 782).

### 5.    Mary Buban, Psy.D. - Medical Expert

During the December 21, 2010 administrative hearing, a non-treating psychologist, Dr. Buban, testified after reviewing the record.  (*PageID#* 107).  Dr. Buban testified that based on Plaintiff's school records, he was not in special education for academic difficulties and had a seventh grade reading level.  (*PageID##* 107-08).  Dr. Buban also indicated that his mental health record shows his symptoms were relatively stable (*PageID#* 108).

Dr. Buban recognized that Plaintiff carries the paranoid schizophrenia diagnosis in the record, but she did not see consistent documentation throughout the entire record of severity.  (*PageID#* 109).  She commented that his 2008 and 2009 treatment records from Daymont West show his symptoms "well controlled and, and not causing significant difficulties" and that "more recent treatment notes indicate pretty much the same."  (*Id.*).  Dr. Buban also noted that the record shows some inconsistencies regarding substance abuse.  (*Id.*).

 Dr. Buban testified that Plaintiff's "predominant restriction is for working around others and with others."  (*PageID#* 109).  Dr. Buban suggested that Plaintiff's work should be independent, once he knows what the task is, he should be left to function independently.  (*PageID#* 110).  Dr. Buban concluded that Plaintiff's restrictions for

14

activities of daily living were moderate; social functioning was marked; concentration, persistence, and pace was moderate.  (*PageID*## 110-11).

## III.    Administrative Review

### A.    "Disability" Defined

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements.  Chief among these, for purposes of this case, is the "disability" requirement.  To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.  An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Sec'y of Health & Human Servs*., 974 F.2d 680, 683 (6th Cir. 1992).

### B.    ALJ McNichols' Decision

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See PageID*## 74-76; *see also* 20 C.F.R. § 416.920(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff has the following severe

impairments: intermittent back pain with mild degenerative disc disease of the lumbar spine; depression; anxiety disorder; history of paranoid schizophrenia; and history of polysubstance abuse (alcohol and cannabis).  (*PageID#* 76).

The ALJ concluded at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the criteria in the Listing of Impairments.  (*PageID#* 78).

At Step 4, the ALJ concluded that Plaintiff retained the RFC to perform medium work with no climbing ropes, ladders or scaffolds; occasional stooping; no exposure to hazards; no dealing with the general public; no complex or detailed instructions; simple, one- or two-step tasks requiring little, if any, concentration; low stress jobs with no production quotas or over-the-shoulder supervision; and limited contact with coworkers and supervisors with no teamwork.  (*PageID#* 80).

At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (*PageID##* 82-83).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for SSI. (*PageID#* 83).

## IV.    <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

16

2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.    Opinion**

17

Plaintiff sets forth two errors in this case: (1) the ALJ erred in failing to find that *res judicata* applies in this case and therefore Plaintiff should have been found disabled; and (2) the ALJ erred in rejecting the opinion of Plaintiff's treating psychiatrist, Dr. Cataldi. (Doc. #7).

### A.  *Res Judicata*

Plaintiff contends that the ALJ erred in failing to find *res judicata* applies in this case and therefore finding Plaintiff disabled.  (Doc. #7 at *PageID#* 807).  According to Plaintiff, he had been on SSI from 1993 to 1998, and his benefits had been terminated as a result of his incarceration and not because of medical improvement.

The Commissioner disagrees with Plaintiff's analysis and argues that requiring the ALJ to apply *res judicata* to an administrative decision made without the benefit of a trial-type hearing is contrary to case law from this Court and around the country, and is inconsistent with the Agency's longstanding policy interpretation of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) and AR 98-4(6).  *See* Doc. #10 at *PageID#* 837.  As a threshold matter, the Court must determine whether the Sixth Circuit's decision in *Drummond* applies in this case.

In *Drummond,* the Sixth Circuit held that Social Security claimants and the Commissioner are barred from re-litigating issues that have previously been determined at the administrative level.  *Drummond,* 126 F.3d at 842; *see also* 42 U.S.C. § 405(h) ("The findings and decision of the Commissioner of Social Security after a hearing shall be binding on all individuals who were parties to such hearing.").  *Drummond* mandates that

18

absent evidence that a claimant's condition has improved, findings issued by an ALJ as part of a prior disability determination are binding on an ALJ in a subsequent proceeding. *Drummond,* 126 F .3d at 841 (citing 20 C.F.R. § 404.905). The Commissioner bears the burden to prove changed circumstances so as to escape being bound by the principles of *res judicata*. *Id.* at 843.

Following the decision in *Drummond,* the Commissioner issued an Acquiescence Ruling mandating that ALJs in Ohio (and other states within the Sixth Circuit) follow *Drummond* by applying *res judicata* to a prior assessment of a claimant's RFC and other prior findings made as part of a sequential evaluation. The Acquiescence Ruling explains:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law ....

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

Here, the parties dispute whether *Drummond* applies under the circumstances this case presents. Plaintiff argues that *res judicata* applies. (Doc.#7 at *PageID##* 807-08). Plaintiff states that he received SSI from 1993 to 1998 until he was incarcerated; his benefits ceased at that time; and when he was released from prison, he re-filed for benefits. Plaintiff argues that under this scenario, it was incumbent upon the Social Security Administration to attempt to locate his prior file and prove, based on a

comparison of that file and the current record, that his condition has not improved between the time he began receiving SSI and the date his benefits ceased. (Doc. #7 at *PageID#* 808). Plaintiff argues that this matter must be remanded "for a more thorough search of the previous record." (*Id.*).

According to the Commissioner, *Drummond* holds that principles of *res judicata* apply only where the SSA has issued a final decision containing a finding of a claimant's RFC following a hearing on a prior disability claim. (Doc.#10 at *PageID##*837-89).

As in *Roark v. Comm'r of Soc. Sec.*, 2011 WL 6751190, 2011 U.S. Dist. LEXIS 147805 (S.D. Ohio, Nov. 29, 2011) (M.J. Litkovitz), and the cases cited therein, this Court finds that *res judicata* is not applicable under the circumstances presented here. It is undisputed that Plaintiff's SSI benefits were terminated as a result of his criminal conviction and incarceration, thus requiring Plaintiff to submit a new application covering a new period of eligibility which began following his release from prison. Plaintiff's previous award of benefits was granted at the first level of review, and thus, he did not have an administrative hearing before an ALJ. (*PageID#* 299). Absent such a trial-type hearing and the findings that follow, the ALJ in this case was not required to apply *res judicata* to this set of facts and circumstances.

There is also conflicting information in the record as to what impairment caused Plaintiff to previously receive benefits. The ALJ noted in his decision that Plaintiff received benefits due to mental retardation. (*PageID#* 79). When Plaintiff was examined by Dr. Bonds, he told Dr. Bonds that he previously received benefits for paranoid

schizophrenia. (*PageID#* 650). Plaintiff's counsel stated during both hearings that he believed Plaintiff received benefits due to paranoid schizophrenia. (*PageID##* 119, 124).

Plaintiff's incarceration rendered him ineligible for benefits and necessitated the filing of a new application to be evaluated under the five-step sequential analysis. Neither Plaintiff nor the Commissioner are seeking to relitigate issues which have previously been determined at a step in that process. Absent such findings, Plaintiff's prior disability determination is of no consequence, and *res judicata* thus has no applicability here. The ALJ was not bound by the SSA's previous disability finding, and properly applied the five-step sequential analysis for a new application. Plaintiff's argument therefore lacks merit.

### B. Listing 12.05

Plaintiff alternatively contends that he meets Listing 12.05. The criteria for mental retardation is contained in §12.05 of the Listings. The first sentence of §12.05 provides:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Subpart P, Appendix, §12.05. Listing 12.05C contains the following two criteria:

1. A valid verbal, performance, or full scale IQ of 60 through 70; and

2. A physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Subpart P, Appendix, §12.05(C).

Plaintiff argues that in determining his impairments do not functionally equal 12.05, the ALJ improperly relied on the opinion of Dr. Buban, who testified at the hearing as a ME. (Doc.#7 at *PageID#* 807). In assessing Plaintiff's impairments and determining functional equivalence, the ALJ reasonably relied on the testimony of the ME. (*PageID#* 79). In *Richardson v. Perales*, 402 U.S. 389, 408 (1971), the Supreme Court held that it is acceptable for the ALJ to use a medical expert, because the expert's primary duty is to make complex medical cases understandable to the layman examiner. Moreover, the medical expert can offer his own opinion regarding the claimant's condition. *See* 20 C.F.R. § 416.927(f)(2). The ALJ can properly rely on the testimony of a non-examining medical expert in order to make sense of the record. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001). In addition, an ALJ's reliance on the opinion of a non-examining medical expert is proper if the expert's opinion is based on objective reports and opinions. *See Barker v. Shalala*, 40 F.3d 789, 794-95 (6th Cir. 1994); *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308-09 (6th Cir. 1990).

The school records provided show that Plaintiff had failing grades in the 9th grade due to "very, very poor attendance," and he was expelled. (*PageID##* 348-53). No IQ scores or special education are indicated. (*Id.*). Plaintiff argues that he must have been in special education classes, "otherwise, there would have been no reason for the special education teacher to be present [at the expulsion hearing]." *PageID#* 808. Plaintiff's school records include the following note from March 23, 1988:

22

> Hearing held in Judith Curran's presence at 3:30 P.M. this date to consider the suspension recommending expulsion from Dunbar High School.  Present at this hearing were: Corby, student; Ms. Horton, grandmother; Ms. Bush, parent; Ms. Curran, Hearing Officer; Ms. Ferguson, Assistant Principal; Mr. Driscoll, Special Education.
>
> Cory's behavior at Dunbar has not changed since the February hearing where Corby was permitted to return to school. He continues to refuse to follow school rules.
>
> The Expulsion Committee has agreed to support the recommendations of the Committee on 2-26-88.  Expulsion would be automatic if Corby failed to keep his promise of attending class, doing work and obeying school rules.
>
> Corby will be expelled from 3-23 through 6-10-88.
>
> . . .

(*PageID#* 349).  Plaintiff appears to believe that simply because this note states that Mr. Driscoll (Special Education) was present at the expulsion hearing, Plaintiff must have been in special education classes, otherwise there was "no reason for the special education teacher to be present."  (*PageID#* 808).  This argument, however, is unpersuasive for many reasons.  For example, due to the nature of an expulsion hearing, it could be common practice for a representative from Special Education (in this case, Mr. Driscoll) to attend all such hearings, regardless of whether the child subject to expulsion is taking special education classes.  As such, Mr. Driscoll's presence at the expulsion hearing does not establish that he is Plaintiff's special education teacher or that Plaintiff is even enrolled in special education classes.  Moreover, a thorough review of the school records actually reveals that Wayne Driscoll is the Special Education Psychologist.  (*PageID#* 352).  Thus, there is nothing to suggest he is even a teacher, let alone Plaintiff's

23

special education teacher, as Plaintiff assumes.  Likewise, the fact Mr. Driscoll appears to have been the Special Education Psychologist, and that he was present at the expulsion hearing, does not establish that Plaintiff took special education courses.

Additional school records also tend to indicate Plaintiff was not enrolled in any special education classes.  For example, his classes during 1987-88 are listed as: Art, Health, English 9, Life Science, Gen. Math, and Speech.  (*PageID#* 353).  There is no indication of any special education courses.  And while he did receive all F's the first semester, the school records provide an apparently clear explanation:  "very, very poor attendance," and numerous other behavioral issues.  (*PageID#* 353).

Also indicative of the fact Plaintiff was not likely enrolled in special education classes is the fact that after his expulsion a request was made on Plaintiff's behalf for "Home Instruction" services, at which time the school mailed a medical form to his parent for completion.  (*PageID#* 350).  After the completed medical form was returned, the school scheduled a conference regarding the request and regarding the <u>development</u> of an Individualized Education Program.  (*PageID##* 350, 352).  The school ultimately denied the request due to Plaintiff's expulsion, and refused to provide Home Instruction. (*PageID#* 350).  The fact the school held a conference regarding the <u>development</u> of an IEP, however, is significant because it supports finding that an IEP was never in existence, and thus, Plaintiff was not a special education student.

This finding is further consistent with Plaintiff's own report that he, in fact, was not in special education classes.  (*PageID##* 649, 652).  In addition, even assuming

24

Plaintiff <u>did</u> take special education classes, a review of his school records indicate it was more likely due to emotional disturbance or behavior issues than cognitive delay.  This is consistent with the testimony of Dr. Buban, who testified that based on Plaintiff's school records, he did not believe Plaintiff was in special education for academic reasons. (*PageID#* 107).

The ALJ also found that Plaintiff "was able to obtain a driver's license but it was suspended due to drug charges. He was incarcerated related to drug trafficking, which suggests fairly sophisticated activity."  (*PageID#* 79).

In addition, a prison IQ test from December 2005 showed a score of 83, indicating low average intelligence.  (*PageID##* 598-99).  Dr. Bonds administered IQ exams, but Plaintiff "did not take testing seriously and was at times uncooperative. He refused to answer on some subtests and put little effort into others."  (*PageID#* 652).  Dr. Bonds considered his IQ score "invalid due to his lack of motivation and effort."  (*Id.*). Plaintiff told Dr. Bonds that he had been "in regular classes," that his grades were poor, and he was suspended for fighting and disciplinary problems, not academic reasons. (*PageID##* 649, 652).  Plaintiff also reported to Dr. Firmin that he did not participate in special education classes, did not have an IEP while in school, but participated in classes for children with emotional or behavioral problems.  (*PageID#* 778).

Accordingly, Plaintiff fails to present evidence that he meets or equals all the requirements of Listing 12.05.

### C.   The Opinion of the Treating Physician

Finally, Plaintiff contends the ALJ erred in rejecting the opinion of treating psychiatrist, Dr. Cataldi.  (Doc. #7 at *PageID#* 809).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875–76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937–38 (6th Cir. 2011); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. Mar.12, 2013).

Generally, "the opinions of treating physicians are entitled to controlling weight." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007), citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997).  However, '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley*, 582 F.3d at 406, *quoting* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  In *Wilson*, 378 F.3d at 546, the Sixth Circuit noted that a treating physician's opinion can be discounted if: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques, (2) it is inconsistent with substantial evidence in the record, (3) it does not identify the evidence supporting its finding, and (4) if it fares

26

poorly when applying the factors listed in 20 C.F.R. § 416.927(d)(2), which include, *inter alia*, the length and frequency of examinations, the amount of evidence used to support an opinion, the specialization of the physician, and consistency with the record.

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 416.927(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 416.927(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions.  *See id.* at *2-*3.  The Regulations explain, "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §416.927(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §416.927(d) including, at a minimum, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §416.972(f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

A review of the ALJ's decision reveals a well-supported description of the medical source opinions and records.  (*PageID##* 76-86).  Contrary to Plaintiff's contentions, the ALJ provided specific reasons for the weight given to Dr. Cataldi's opinion. Dr. Cataldi was Plaintiff's treating psychiatrist. The ALJ did not give Dr. Cataldi's opinions

controlling or deferential weight because he concluded they were not well-supported by objective findings or other credible corroborating evidence and because they were inconsistent with other credible evidence.  This appeared in the ALJ's finding that Dr. Cataldi did not provide any detailed explanation for such a serious degree of limitation. Most notably, the claimant denied any substance abuse to him and the social worker at Daymont (except for years/decades before the initial evaluation in January 2009), yet he admitted to Dr. Bonds in early 2008 that he smoked marijuana daily and still drank alcohol.  (*PageID#* 78).  The ALJ further explained that Plaintiff did not see Dr. Cataldi often, and his notes reflect that Plaintiff was off medications between many of the visits. His records also show that medications helped Plaintiff's condition. (*Id.*). In addition, the ALJ noted that there is no evidence of any psychiatric hospitalizations relevant to the time frame, and Plaintiff clearly set forth poor efforts in doing the IQ testing with Dr. Bonds, to the point Dr. Bonds deemed the scores to be invalid.  (*PageID##* 78-79).

As noted above, in addition to determining that Plaintiff does not equal or meet Listing 12.05, the ALJ accorded substantial deference to the opinion of Dr. Buban as to Plaintiff's functional mental work abilities. As noted above, Dr. Buban is the medical expert who testified at the second administrative hearing. She testified that while the record may document that Plaintiff carries the paranoid schizophrenia diagnosis, she did not see it consistently documented.  (*PageID#* 109).  Furthermore, she commented that his 2008 and 2009 treatment records from Daymont West actually show his symptoms "well controlled and . . . not causing significant difficulties" and that "more recent

28

treatment notes indicate pretty much the same." (*Id.*). Dr. Buban also noted that the record shows some inconsistencies regarding substance abuse. (*Id.*).

Dr. Buban testified that Plaintiff's "predominant restriction is for working around others and with others." (*PageID#* 109). The ALJ found that Dr. Buban's conclusions were generally consistent with the assessment by Dr. Williams, a reviewing psychologist, and with the mental status findings of Dr. Bonds and Dr. Firmin. (*PageID#* 80).

Plaintiff has not established that the ALJ erred as a matter of law in weighing Dr. Cataldi's opinions. *See, e.g., Rogers.*, 486 F.3d at 234; *Wilson*, 378 F.3d at 541. Without such a showing, the Court is not free to re-weigh the medical source opinions or to resolve other evidentiary conflicts. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)("there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

For all the above reasons, Plaintiff's challenges to the ALJ's rejection of Dr. Cataldi's opinions and to the ALJ's evaluation of his mental work abilities lack merit.

### IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability determination be affirmed; and

2.  The case be terminated on the docket of this Court.

August 2, 2013

_____s/Sharon L. Ovington_____
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).